## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

In re:

JOSEPH JAMES PROMISCO,

Debtor.

JOSEPH JAMES PROMISCO,

Plaintiff,

v.

UNITED STATES DEPARTMENT
OF EDUCATION,

Defendant.

Chapter 7
Bankruptcy No. 19 BK 02949
Honorable Judge Jack B. Schmetterer

Adversary No. 19 AP 00682

## MEMORANDUM DECISION

## INTRODUCTION

Plaintiff-debtor Joseph James Promisco ("Plaintiff") seeks a determination following trial of this case that his student loan obligations to the United States Department of Education (the "Department of Education") are dischargeable as an undue hardship under Section 523(a)(8) of Title 11 of the United States Code.

For reasons stated herein, which constitute the Court's Findings of Fact and Conclusions of Law, it is held that Plaintiff has not met his burden to establish that repayment of his student loans would impose an undue hardship under 11 U.S.C. § 523(a)(8) as defined by this Circuit. A corresponding Judgment Order consistent with this decision shall be entered concurrently herewith.

## JURISDICTION

Subject matter jurisdiction lies under 28 U.S.C. § 1334. The district court may refer bankruptcy proceedings to a bankruptcy judge under 28 U.S.C. § 157 and 28 U.S.C. § 1334, and this proceeding was thereby referred here by Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. Venue lies under 28 U.S.C. § 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I). "A bankruptcy judge has constitutional authority to enter final judgment as to dischargeability." *In re Monarrez*, 588 B.R. 838, 845 (Bankr.

1

N.D. Ill. 2018) (Barnes, T.); *see also Stern v. Marshall*, 564 U.S. 462 (2011) (matters of nondischargeability stems from the bankruptcy itself).

## FINDINGS OF FACT[1]

A. Plaintiff's History and Financial Circumstances

1. Plaintiff is indebted to the United States Department of Education on the following 17 loans made by the Department under the William D. Ford Federal Direct Loan Program under Title IV, Part D of the Higher Education Act of 1965, 20 U.S.C. 1087a *et seq.* (collectively, the "Department of Education Loans").

| Disbursement Date | Disbursement Amount | Interest Rate |
|---|---|---|
| 8/17/08 | $1,765.00 | 6.00 |
| 8/17/08 | $2,535.00 | 6.80 |
| 8/29/11 | $6,500.00 | 6.80 |
| 9/20/12 | $2,250.00 | 3.40 |
| 9/20/12 | $1,000.00 | 6.80 |
| 2/22/13 | $500.00 | 6.80 |
| 2/22/13 | $3,250.00 | 3.40 |
| 8/17/13 | $5,500.00 | 3.86 |
| 8/17/13 | $7,000.00 | 3.86 |
| 8/20/14 | $20,500.00 | 6.21 |
| 8/20/14 | $31,720.00 | 7.21 |
| 8/19/15 | $20,500.00 | 5.84 |
| 8/19/15 | $32,110.00 | 6.84 |
| 8/17/16 | $10,250.00 | 5.31 |
| 8/17/16 | $16,026.00 | 6.31 |
| 1/4/17 | $10,250.00 | 5.31 |
| 1/4/17 | $16,026.00 | 6.31 |

2. The Department of Education calculates that, as of February 13, 2020, Plaintiff's total indebtedness on the Department of Education Loans was $244,231.60.

3. The Department of Education Loans are currently in administrative forbearance due to Plaintiff's bankruptcy.

4. Prior to filing his bankruptcy petition, Plaintiff applied for and participated in an income-driven repayment plan offered by the Department of Education, the Pay As You Earn ("PAYE") plan.

5. Plaintiff submitted his application for an income-driven repayment plan on March 16, 2018.

---

[1] The Findings of Fact are drawn from the docket, the parties' stipulations of fact, and the testimony and evidence presented and admitted at trial.

6. On or about March 21, 2018, the servicer of the Department of Education Loans notified Plaintiff that his monthly payment for the Department of Education Loans under the PAYE plan would be $0 beginning on April 21, 2018.

7. The monthly payment under a PAYE plan is 10% of a borrower's discretionary income, which is defined as the difference between the borrower's adjusted gross income and 150 percent of the U.S. Department of Health and Human Services Poverty Guideline amount for the borrower's family size and state – divided by 12.

8. Under PAYE, borrowers must recertify every year by providing their previous year's income which may lead to a change in payment if borrower's income has changed.

9. Plaintiff has made $0 in payments on the Department of Education Loans.

10. On March 29, 2017, Plaintiff, as part of a plea deal negotiated between the Illinois prosecution and Plaintiff's Illinois attorney, pled guilty to, and was convicted of, the crime under 720 ILCS 5/11-20.1(a)(6).

11. On March 29, 2017, the Circuit Court of Cook County, Illinois, accepted the negotiated plea deal and entered a sentencing order that sentenced Plaintiff to 24 months of probation and required him to register as a sex offender.

12. Plaintiff has appealed his Illinois conviction to the Illinois Appellate Court.

13. Based on the same alleged conduct underlying his conviction in Illinois, Plaintiff was extradited to California, the state of residence of the alleged victim.

14. In the Superior Court of the State of California, as part of the negotiated plea deal between the California prosecution and Plaintiff's California attorney, Plaintiff pled nolo contendere to, and was convicted of, the crime in violation of California Penal Code Section 288.2(a)(2).

15. Accepting the negotiated plea, the Superior Court of California sentenced Plaintiff to three years of imprisonment, but suspended the execution of the sentence, placing him on formal probation for a period of 5 years, and required him to register as a sex offender. Plaintiff was also required to complete a counseling program.

16. Plaintiff has retained an attorney to file a habeas petition challenging his California conviction. The initial cost of the attorney's retention was $5,000 and Plaintiff agreed to pay the attorney an additional $10,000 as a retainer to be paid monthly in installments of $2,500 commencing August 7, 2020. This fee does not include representation in a potential

3

appeal if the petition is denied or criminal pre-trial/trial process if the petition is granted and the conviction and plea is vacated.

17. The alleged conduct underlying Plaintiff's conviction occurred in March 2016, while he was a student at DePaul University's law school.

18. Based on the same alleged incident underlying his criminal convictions, DePaul University permanently dismissed Plaintiff from its law school in October 2017 during his sixth semester in law school.

19. From October 16, 2018, to March 15, 2020, Plaintiff held a job as a Membership Assistant at Costco. This position was seasonal until January 2019 and was part time until September 2019 when he was promoted to full-time.

20. After being promoted to full-time, Plaintiff worked 38 hours per week and made $16 per hour for work performed on weekdays and Saturdays and $24 per hour for work performed on Sundays.

21. Plaintiff's total gross income in 2019 was $30,301.

22. Prior to March 15, 2020, the total amount of Plaintiff's average monthly expenses was $902, which was composed of $140 in utilities, $250 in food expenses, $40 in clothing expenses, $115 in medical and dental expenses, $235 in automobile fuel and maintenance expenses, $74 in automobile insurance, $4 in charitable giving, and $44 in miscellaneous other expenses.

23. From September 2019 to March 15, 2020, the total amount of Plaintiff's average monthly net income (without considering any tax refund) was $1,883, which was composed of $2,915 in gross income minus $590 in withholding and social security taxes, $147 for health, dental, and disability insurance, $291 for retirement plan contributions, and $4 for an employee fund.

24. Plaintiff's last day of work at Costco was March 15, 2020, and he was terminated by Costco effective March 25, 2020.

25. Plaintiff received unemployment benefits from March 15, 2020, to July 20, 2020, in the amount of $268 per week, minus a 14.9 percent tax withholding, from the Illinois Department of Employment Security.

26. From April 6, 2020, to July 20, 2020, Plaintiff received $600 per week in unemployment insurance, minus a 14.9 percent tax withholding, under the CARES Act.

4

27. In April 2020, the Illinois Department of Human Services approved Plaintiff's application for Supplemental Nutrition Assistance (SNAP) benefits and medical benefits under Medicaid. Plaintiff received $194 per month in SNAP benefits until his SNAP benefits terminated on August 1, 2020.

28. In July 2020, Plaintiff obtained full-time employment with Camping World as an Inventory Coordinator. In this position, he earns $18 per hour and works approximately 40 hours per week.

29. As of August, 2020, the total amount of Plaintiff's average monthly expenses (not including current legal fees) is $1,063, which is composed of $140 in utilities, $400 in food expenses, $40 in clothing expenses, $365 in automobile fuel, toll, and maintenance expenses, $74 in automobile insurance, and $44 in miscellaneous other expenses. Plaintiff anticipated monthly medical expenses of $130 per month starting in September 2020 when his health insurance becomes active to cover seeing a mental health provider which would make his total average monthly expenses $1,193 as of September 2020.

30. The total amount of Plaintiff's average monthly net income (without considering any tax refund) for August 2020 is $2,235, which is composed of $3,120 in gross income minus $573 in withholding and social security taxes and $312 in 401(k) plan contributions.

31. Starting September 2020, the total amount of Plaintiff's average monthly net income (without considering any tax refund) is anticipated to be $1,854, which is anticipated to be composed of $3,120 in gross income minus $573 in withholding and social security taxes, $312 in 401(k) plan contributions, and $381 for health, dental, accident, life, and disability insurance.

32. Plaintiff lives with family members—including his mother, his sister, his brother, his aunt, and his uncle—in a single-family home commonly known as 2000 N. 74th Avenue, Elmwood Park, Illinois 60707 (the "Property").

33. Plaintiff has resided at the Property since he was born.

34. Plaintiff has not made any payments toward rent or housing expenses since mid-2016, after he was arrested in May 2016.

35. The Property is currently encumbered by a mortgage in favor of Deutsche Bank National Trust Company, as trustee for Morgan Stanley Structured Trust I 2007-1 Asset-Backed Certificates.

5

36. The only surviving mortgagor for the Property is Plaintiff's mother, Robin Promisco.

37. Plaintiff is currently not legally obligated to make mortgage payments.

38. No foreclosure action is currently pending against the Property.

39. PHH, the mortgage servicer, sent a "Notice of Intention to Foreclose" dated July 5, 2019, to Kenneth and Robin Promisco (Plaintiff's parents) demanding $75,018.19 to cure an alleged default by 08/09/2019. The letter further stated that if payment was not made by the date, the foreclosure process would be initiated.

40. In November 2019, counsel for Deutsche Bank sent a letter to Kenneth Promisco, Plaintiff's father, stating that he owed $379,299 and raising the possibility of commencing foreclosure proceedings.

41. According to the mortgage statement issued for the Property, the outstanding principal balance for the mortgage is approximately $299,000 and the monthly payments are $2,022.

42. There is a dispute between Plaintiff, Robin Promisco (the mortgagor), and Deutsche Bank as to the amount owed on the mortgage.

43. Plaintiff and Robin Promisco have attempted to contact Deutsche Bank to reach a settlement regarding the amount owed on the mortgage.

44. Two previous foreclosure actions have been brought against the Property; the first action was settled in 2013 and the second action was withdrawn by plaintiff Deutsche Bank in 2018.

45. Robin Promisco was a recipient of SNAP and Medicaid until approximately through June 2020 when she returned from her seasonal furlough that was extended due to the Governor J.B. Pritzker's stay at home order.

46. Kenneth Promisco passed away on November 1, 2019.

47. The cost of Kenneth Promisco's funeral was approximately $15,000, which was primarily financed by credit card debt incurred by Megan Promisco (his daughter) and Daniel Promisco (one of his sons).

48. Prior to Kenneth Promisco's death, Kenneth and Robin Promisco owned the Property.

49. Plaintiff believes that, under Illinois probate law, he and his siblings, Megan and Daniel, are successors in interest to Kenneth Promisco's ownership interest in the Property.

50. Plaintiff's mother, Robin Promisco, was approved by the SSA for SSI benefits beginning in February 2020 as the surviving spouse of Kenneth Promisco in the amount of $292 per month.

51. Robin Promisco currently works at Oak Park Country Club making $14 per hour.

52. Robin Promisco works between 30-40 hours per week depending on the needs of her employer.

53. Robin Promisco has health insurance through her employer.

54. Robin Promisco cannot obtain employment requiring strenuous physical activity due to her health and age of 61.

55. Other than any possible interest in the Property, Plaintiff's only other major asset is his car, valued at approximately $6,000 as of Plaintiff's bankruptcy filing in February 2019.

56. As a result of being a registered sex offender, Plaintiff cannot move to an alternative residence located within 500 feet of a school, playground, or daycare facility.

57. Plaintiff was offered a position at RSM, an accounting and consulting firm, in May 2018. However, the offer was withdrawn due to his criminal record.

58. Plaintiff was interviewed by the Office of the Comptroller of the Currency in November 2018, but no offer was made after a background investigation was conducted.

59. Plaintiff's application for a $250 secured line of credit with Navy Federal Credit Union in approximately July 2019 was denied on the ground that he had excessive credit obligations in relation to income.

60. The Small Business Administration extended Plaintiff a tentative offer of employment as a loan assistant in April 2020 but Plaintiff was disqualified from this position in May 2020 based on his criminal record.

## CONCLUSIONS OF LAW[2]

Student loans are explicitly enumerated as one of the specific debts excluded from the general discharge provided by the Bankruptcy Code. 11 U.S.C. § 523(a)(8). Because such loans are presumptively non-dischargeable, debtors bear the burden to overcome this presumption of non-dischargeability with an "affirmative showing that excepting the student loans from the general discharge would impose an undue hardship on the debtor and his or her dependents." *In re Hanson*, 397 F.3d 482, 484 (7th Cir. 2005). The hardship must be more than the "garden-variety"

---

[2] Findings contained in this "Conclusions of Law" section shall stand as additional findings of fact.

that is present in all bankruptcy filings. *O'Hearn v. Educ. Credit Mgmt. Corp.*, 339 F.3d 559, 564 (7th Cir. 2003).

The Seventh Circuit has adopted the *Brunner* test in determining undue hardship. *Matter of Roberson*, 999 F.2d 1132, 1135 (7th Cir. 1993). Plaintiff argues that the *Brunner* test is too restrictive in determining undue hardship and advocates for approaches implemented in other circuits. *See, e.g., In re Long*, 322 F.3d 549, 554 (8th Cir. 2003) ("We prefer a less restrictive approach to the 'undue hardship' inquiry . . . requiring our bankruptcy courts to adhere to the strict parameters of a particular test would diminish the inherent discretion contained in § 523(a)(8)(B) [and therefore we continue] to embrace a totality-of-the-circumstances approach to the 'undue hardship' inquiry."). Nonetheless, this lower court is bound to binding authority from the Seventh Circuit. Unless and until the Seventh Circuit Court of Appeals revisits the issue, bankruptcy courts in this Circuit are obliged to follow *Brunner*.

The *Brunner* test for undue hardship requires that a debtor make a three-part showing that: (1) he cannot maintain, based on current income and expenses, a "minimal" standard of living for him or herself and his dependents if required to repay the student loans; (2) additional circumstances exist which indicate that this state of affairs is likely to persist for a significant portion of the repayment period; and (3) a good faith effort has been made to repay the loans. *Roberson*, 999 F.2d at 1135 (citing *Brunner v. New York State Higher Educ. Servs. Corp.*, 831 F.2d 395 (2d Cir. 1987)). The debtor bears the burden of establishing each element by a preponderance of the evidence. *Goulet v. Educ. Credit Mgmt. Corp.*, 284 F.3d 773, 777 (7th Cir. 2002) (citing *Grogan v. Garner*, 498 U.S. 279, 291 (1991)).

## A. Plaintiff is Unable to Maintain a Minimal Standard of Living If Required to Repay the Student Loans

The first prong of the *Brunner* test requires the Plaintiff to prove that he would be unable to maintain a minimal standard of living for himself and for his dependents if forced to pay on his student loan debt. *Roberson*, 999 F.2d at 1135. Of particular concern, courts consider whether the debtor has maximized income and minimized expenses. *In re Davis*, 608 B.R. 693, 704 (Bankr. N.D. Ill. 2019) (Barnes, T.).[3]

---

[3] While the analysis of maximizing income and minimizing income traditionally fell under the third prong of the *Brunner* test, some courts conduct this analysis under the first prong since the question of whether a minimal standard of living can be maintained is intricately intertwined with reducing unnecessary expenses. *See, e.g., In re*

1. Plaintiff's Net Monthly Income Total, at Most, $973

Plaintiff's average monthly gross income totals $3,120. Of that amount, $573 is subtracted for withholding and social security taxes, and Plaintiff makes monthly contributions of $312 to his 401(k) plan contributions. As such, his claimed monthly net income is $1,854. His expenses total $1,193, which is composed of utility, food, clothing, transportation, medical, and miscellaneous other costs. Therefore, his current average monthly income exceeds his monthly expenses by at least $661, notwithstanding his monthly contribution of $312 to his 401(k) account.

The Department of Education does not challenge that Plaintiff has not maximized income. Rather, the Department of Education argues that Plaintiff has not properly minimized expenses as his 401(k) contributions are not reasonably necessary to maintain a minimal standard of living. Indeed, some courts have held so. *See, e.g., In re Perkins*, 318 B.R. 300, 306 (Bankr. M.D.N.C. 2004) ("401(k) contributions generally are not regarded as reasonably necessary for the support or maintenance of a debtor and thus may be considered as available income . . . [that] a debtor seeking a § 523(a)(8) undue hardship discharge could use to repay an educational loan.") (citing cases).

This Court declines to adopt a bright-line rule holding that 401(k) contributions are never reasonably necessary. "[B]ankruptcy courts have discretion to determine whether retirement contributions are a reasonably necessary expense for a particular debtor based on the facts of each individual case." *In re Craig*, 579 F.3d 1040, 1046 (9th Cir. 2009). Under the *Brunner* test, debtors need not "live in abject poverty" to meet the minimum standard of living prong, but merely "are expected to live within the strictures of a frugal budget for the foreseeable future." *In re Clark*, 341 B.R. 238, 249 (Bankr. N.D. Ill. 2006). "Just as a court should not be in the business of deciding which recreational activities are acceptable and which are not so long as the overall total spent on discretionary expenses is frugal, a court should not punish a debtor who tightens his budget to the limit to put a small amount away for the future or for a rainy day." *In re Larson*, 426 B.R. 782, 792 (Bankr. N.D. Ill. 2010) (internal quotations and citations omitted). Rather, to determine whether a retirement contribution is reasonably necessary, this Court agrees with the test as stated by the Ninth Circuit Court of Appeals in *Hebbring v. U.S. Tr.*:

> In making this fact-intensive determination, courts should consider a number of factors, including but not limited to: the debtor's age, income, overall budget, expected date of retirement, existing retirement savings, and amount of contributions; the likelihood that

---

*Tuttle*, 600 B.R. 783, 796 (Bankr. E.D. Wis. 2019). Given the aforementioned, this analysis will be considered here and later restated in the third prong.

9

> stopping contributions will jeopardize the debtor's fresh start by forcing the debtor to make up lost contributions after emerging from bankruptcy; and the needs of the debtor's dependents. Courts must allow debtors to seek bankruptcy protection while voluntarily saving for retirement if such savings appear reasonably necessary for the maintenance or support of the debtor or the debtor's dependents.

463 F.3d 902, 907 (9th Cir. 2006) (internal citations omitted).

Applied to this case, despite Plaintiff's scarce savings, meager income in comparison with expenses, and the frugal nature of the rest of his budget, because of Plaintiff's young age and the relatively high amount of his contributions without explanation, the Court concludes Plaintiff has not met his burden to demonstrate that his monthly \$312 in 401(k) contributions are reasonably necessary. Consequently, it is held that Plaintiff has, at most, \$973 in excess net income each month.[4]

2. Excess Net Monthly Income Does Not Preclude a Finding that Plaintiff Cannot Maintain a Minimal Standard of Living

However, the fact that a debtor has excess income available to make monthly payments on his student loans is not dispositive of the first prong of the *Brunner* test. *See In re Durrani*, 311 B.R. 496, 505 (Bankr. N.D. Ill. 2004), *aff'd sub nom. Educ. Credit Mgmt. Corp. v. Durrani*, 320 B.R. 357 (N.D. Ill. 2005) ("The question framed by *Brunner* in this first prong is whether [the debtor] can maintain a minimal standard of living if she is required to repay this loan, not whether she has any surplus in her budget available for a monthly payment.").

Plaintiff's total indebtedness on the Department of Education Loans, as of February 13, 2020, was \$244,231.60. The debt is accruing interest at \$39.79 per day. Calculated monthly, the debt is increasing by approximately \$1,210 every month. Thus, despite the fact that Plaintiff has a \$973 surplus, even if Plaintiff contributed all of his \$973 excess income each month to contributions on the debt, his payments would not be sufficient to cover the interest alone. As a result, the Department of Education loans would never be paid off but instead would continue to grow. Clearly, Plaintiff cannot maintain a minimal standard of living and repay this loan.

---

[4] Plaintiff additionally argues that his net income is even less than \$973, given that his current budget does not account for: (a) anticipated housing costs, given Plaintiff's current rent-free living arrangements to which he asserts will not last forever; (b) costly legal bills in connection with challenging his criminal convictions; and (c) miscellaneous family household expenses. The Department of Education disputes that these expenses are properly attributable to Plaintiff. However, as explained in the next section, the exact amount of Plaintiff's net monthly excess, whether it be \$973 or less as Plaintiff claims, is immaterial.

### 3. The Availability of Income-Based Repayment Plans Is Not Dispositive

The Department of Education asserts that income-based repayment plans are available to Plaintiff, to which he can take advantage of to both make repayments on his debt while maintaining a minimal standard of living. For example, it has been estimated that Plaintiff's monthly payment under the PAYE income-based repayment plan would only be $70 per month.

However, the mere availability of repayment plans is not a conclusive basis for finding that a debtor has sufficient net income to meet the first prong of the *Brunner* test. *See In Re Murray*, 563 B.R. 52, 59–60 (Bankr. D. Kan. 2016), *aff'd sub nom. Educ. Credit Mgmt. Corp. v. Murray*, No. 16-2838, 2017 WL 4222980 (D. Kan. Sept. 22, 2017) ("The [court] rejects the availability of repayment plans as a basis for finding [debtors'] net income to be sufficient to repay the loans while maintaining a minimal standard of living."). Indeed, "the availability of [income-based repayment plans] cannot be a magic wand that when waved precludes discharge of a student loan debt." *Durrani*, 311 B.R. at 506.

Therefore, whether a debtor can afford an income-based repayment amount is not instrumental in determining whether a minimal standard of living can be maintained while repaying on the loan. Indeed, courts have consistently found undue hardship where income-based repayment amounts would be set at $0 per month. *See id.* (citing cases). To hold otherwise would mean that all zero payment cases would result against a finding of undue hardship and result in all student loan discharges impossible, a conclusion that would conflict with the Bankruptcy Code and would deprive the bankruptcy court of its authority to determine dischargeability of student loans. *See In re Crawley*, 460 B.R. 421, 438 (Bankr. E.D. Pa. 2011); *see also Grawey v. Illinois Student Assistance Comm'n*, 2001 WL 34076376, at *6 (Bankr.C.D.Ill. Oct.11, 2001) ("Unlike the income contingent repayment plan, bankruptcy relief is designed to give the honest but unfortunate debtor a fresh start. And although government guaranteed student loans are meant to be more difficult to discharge than general unsecured debts, they are not meant to be impossible to discharge.").

Here, the income-based repayment plans available to Plaintiff, although affordable, would not constitute repayment of Plaintiff's student loan debt. The payments would not even be sufficient to pay the interest accruing. Even if Plaintiff were to take advantage of these income-based repayment plans, Plaintiff's student loan debt would increase, not decrease. Therefore, Plaintiff has met his burden to satisfy the first prong of the *Brunner* test.

11

**B. Plaintiff's Inability to Pay is Not Likely to Persist**

The second prong of the *Brunner* test requires the debtor to "show his dire financial condition is likely to exist for a significant portion of the repayment period." *Roberson*, 999 F.2d at 1135. Debtors who demonstrate "evidence not only of current inability to pay but also of additional, exceptional circumstances, strongly suggestive of continuing inability to repay over an extended period of time, more reliably guarantees that the hardship presented is 'undue.'" *Id.* at 1136 (quoting *Brunner*, 831 F.2d at 396).

Examples of such additional, exceptional circumstances, as provided by the Seventh Circuit in *Goulet v. Educ. Credit Mgmt. Corp.*, include "psychiatric problems, lack of useable job skills and severely limited education." 284 F.3d at 778 (citing *Roberson*, 999 F.2d at 1137). "This standard is very difficult to meet and generally only debtors who are severely disabled, have psychiatric issues, have no usable job skills, or have very limited education are able to show that their inability to pay for the entire period is a 'matter of fact rather than speculation.'" *In re Bukovics*, 587 B.R. 695, 707 (Bankr. N.D. Ill. 2018) (citation omitted).

Plaintiff provides several arguments as to why his inability to repay the Department of Education loans while maintaining a minimum standard of living is likely to persist for an extended period of time. First, Plaintiff argues, in the interim where he's appealing his convictions, that his current criminal convictions and requirement to register as a lifetime sex offender are additional, exceptional circumstances that will continue to hinder his ability to find better employment options to improve his current financial condition. In support of this, Plaintiff points to declined job offers, including a rescission of an offer after a background check was conducted. Second, Plaintiff asserts that he will have to support his mother more and more financially as she ages and eventually retires. Third, Plaintiff contends that looming housing expenses will need to be addressed. Fourth, Plaintiff points to the current COVID pandemic as a factor that will continue to have a lasting impact on any brighter economic possibilities. However, the record does not support his assertions.

1. Plaintiff's Criminal Conviction and Registration Requirements Have Not Obstructed Plaintiff's Employment Prospects

Plaintiff has hired legal counsel to appeal his criminal convictions, believing irregularities exist sufficient enough to warrant a *habeus corpus* petition. Therefore, on one hand, Plaintiff argues that these expensive legal fees are necessary and proper expenses (for the first prong of the *Brunner* test) to vacate an improper conviction which he contends will likely succeed. Conversely,

12

on the other, Plaintiff argues that his criminal convictions is an additional circumstance that is likely to persist far into the future. These positions are inconsistent. Should the criminal convictions be overturned as Plaintiff believes, the removal of this claimed impediment will allow Plaintiff to seek better employment options. And should the criminal convictions stand, despite Plaintiff's assertion that they would be a bar to improved circumstances in the future, his situation and job history demonstrates otherwise.

In spite of his criminal convictions, while Plaintiff has introduced evidence of specific instances where he has been unable to obtain employment after a background check had been conducted, his recent work history has demonstrated an increase in his financial circumstances. While his background may not be the ideal kind employers are looking for, Plaintiff is relatively young and healthy and has a college degree in finance. Notwithstanding his convictions, Plaintiff has obtained two full-time jobs. At his first position, Plaintiff obtained two promotions within a year, from seasonal to part-time to full-time. Then, after his first position ended, he immediately found another position with higher pay with another employer. Furthermore, the record demonstrates that Plaintiff has the resources to travel and seek better employment opportunities and the skills to obtain pay raises, promotions, and higher playing jobs with other employers. Accordingly, given his recent work history, which demonstrates his employability and suggests of increased financial circumstances in the future, Plaintiff has not demonstrated that his inability to pay for the entire period of the loans is indeed a matter of fact rather than speculation.

2. Plaintiff's Mother's Is Not a Dependent

Section 523(a)(8) discharges student loans if such debts "would impose an undue hardship on the debtor and the debtor's dependents." 11 U.S.C. § 523(a)(8). Because the Bankruptcy Code does not define the term "dependent" or provide any guidance in determining who is a dependent for purposes of the statute, courts have addressed the definition of "dependent" in the context of other provisions of the Bankruptcy Code and from the definition as set forth in the Internal Revenue Code ("IRS"). *See In re Dunbar*, 99 B.R. 320, 324 (Bankr. M.D. La. 1989); *In re Grove*, 323 B.R. 216, 228 (Bankr. N.D. Ohio 2005). Generally, courts that have addressed the issue of independent adults have concluded that independent adults should generally not be viewed as dependents under 523(a)(8) absent a legal obligation or other extraordinary circumstances. *See In re Gill*, 326 B.R. 611, 633 (Bankr. E.D. Va. 2005) (collecting cases).

13

Here, Plaintiff has not demonstrated that his independent adult mother is a dependent for purposes of the undue hardship analysis. He has not established that his mother qualifies as a legal dependent as defined by the IRS and that he has in fact taken her mother as a dependent on her tax returns. Rather, the evidence suggests that Plaintiff's mother could not meet the IRS' definition of dependent as Plaintiff does not provide more than half of her financial support. *See Publication 501*, IRS (Nov. 19, 2020), https://www.irs.gov/forms-pubs/about-publication-501. Nor has Plaintiff demonstrated that she would qualify as so under some other general standard that Plaintiff's mother is a person who reasonably relies on Plaintiff for support and whom Plaintiff has reason to and does support financially for purposes of the undue hardship analysis. Instead, the evidence demonstrates that Plaintiff's mother receives steady income from her job, has unemployment insurance, and receives support from family members other than Plaintiff. Therefore, because Plaintiff's mother is not a proper dependent, any voluntary support provided by Plaintiff to her in the future cannot be held to be an additional circumstance to satisfy the second prong of the *Brunner* test.

### 3. Claims of Ordinary Housing Expenses Are Not Extraordinary

Dischargeability of student loans "requires evidence 'of additional, *exceptional* circumstances, strongly suggestive of continuing inability to repay over an extended period of time.'" *Goulet*, 284 F.3d at 778 (quoting *Roberson*, 999 F.2d at 1136) (emphasis added). To demonstrate this, "a debtor must precisely identify his problems and explain how his condition will impair his ability to work in the future." *In re Tuttle*, 600 B.R. 783, 801 (Bankr. E.D. Wis. 2019) (citation omitted).

Plaintiff claims that future housing costs will be an additional that will hinder him from paying off the loans in the future. But, typical housing costs are ordinary expenses faced by all debtors. Plaintiff has presented no evidence regarding heightened or unusually-high costs associated with his housing expenses. Nor has he explained how ordinary housing expenses will impair his ability to work in the future. Accordingly, Plaintiff has failed to demonstrate that future housing expenses will be an additional, exceptional circumstance justifying dischargeability.

### 4. Speculative Future Predictions Are Insufficient

General hardship based on present economic downturns alone is not an additional, exceptional circumstance justifying discharge. *See In re Nelsen*, 404 B.R. 892, 895 (Bankr. E.D. Wis. 2009) (downturn in business due to slow economy did not qualify as an exceptional

14

circumstance as the challenge is a common problem faced by "the vast majority of debtors in bankruptcy"). To meet the second requirement of the *Brunner* test, the debtor "must show his dire financial condition is likely to exist for a significant portion of the repayment period." *Roberson*, 999 F.2d at 1135.

Plaintiff argues that the current pandemic makes any financial certainty impossible, and the effects thereto will continue well into the foreseeable future. However, no evidence was presented as to that assertion and therefore Plaintiff has failed to meet his burden of proof. Speculative predictions of future economic downturn are insufficient to stand as additional, exceptional circumstances. *See Educ. Credit Mgmt. Corp. v. DeGroot*, 339 B.R. 201, 213 (D. Or. 2006) (denying discharge where debtor failed to provide evidence establishing that the general economic condition will persist long-term); *In re Gibson*, 428 B.R. 385, 391 (Bankr. W.D. Mich. 2010) (declining to conclude that generalized economic turmoil may serve as a substitute for a more case-specific evaluation of a student loan debtor's future prospects and holding that layman debtor's opinion about the state of the economy was entitled to very little weight given the cyclical nature of the economy). Accordingly, Plaintiff has not shown that the current pandemic is an additional, exceptional circumstance.

In conclusion, because Plaintiff has not shown that his inability to pay is likely to exist for a significant period of time, Plaintiff has failed to demonstrate the existence of additional circumstances required to meet his burden under the second prong of the *Brunner* test.

## C. Plaintiff Has Not Demonstrated A Good Faith Effort to Repay the Loans

The third and final prong of the *Brunner* test requires the debtor to demonstrate "good faith efforts to repay the loans." *Roberson*, 999 F.2d at 1135. This effort is "measured by [a debtor's] efforts to obtain employment, maximize income, and minimize expenses." *Id.* "Furthermore, undue hardship encompasses a notion that the debtor may not willfully or negligently cause his own default, but rather his condition must result from 'factors beyond his reasonable control.'" *Roberson*, 999 F.2d at 1136 (quoting Comm'n on the Bankruptcy Laws of the United States, Report, supra, Pt. II, at 140 n. 16). "The inquiry includes a determination of whether the debtor was negligent or irresponsible in conducting his financial affairs such that the debtor's misfortune is self-imposed." *Clark*, 341 B.R. at 255. Plaintiff has not met his burden under this prong.

The Department of Education argues that the lack of a single payment on the debt, the attempt to discharge the debt within merely two years after expulsion from school, and Plaintiff's

15

criminal conduct preclude a finding of good faith. With respect to the latter, the Department of Education asserts that Plaintiff's criminal conduct, which led to his dismissal from law school (and thereby limiting future employment opportunities or earning potential), was not a factor beyond the debtor's reasonable control and is therefore a bar against a finding of good faith. In support, the Department of Education cites to *In re Hurley*, a case in where the Bankruptcy Appellate Panel of the Ninth Circuit held, despite a longstanding history of student loan payments, that the debtor's willful engagement in criminal activity, which led to him being disbarred, incarcerated, and destitute, precluded a finding of good faith. 601 B.R. 529, 535 (B.A.P. 9th Cir. 2019).

But, in *Hurley*, the court only agreed that past criminal conduct could be considered in the good faith analysis, and declined to endorse "a bright-line rule that a debtor with a criminal past can never establish good faith." *Id.* at 536. Instead, the appellate panel's affirmance of the finding against good faith in *Hurley* was made not solely on the debtor's criminal conduct alone, but rather after consideration of all the circumstances. *Id.* Accordingly, this Court also rejects the adoption of a *per se* rule holding that criminal convictions are a categorical bar to a finding of good faith. Indeed, in *Roberson*, where the *Brunner* test was first adopted by this Circuit, the Seventh Circuit did not hold that the debtor's two drunk driving convictions automatically precluded a finding of good faith. 999 F.2d at 1137-38. Hence, instead of a bright-line rule, determinations of good faith ought to be made on a case-by-case basis. *See, e.g., Koll v. U.S. Dep't of Educ.*, No. 01-8068, 2002 WL 32001509, at \*5 (Bankr. C.D. Ill. May 3, 2002) (refusing a bright-line test that precluded the debtors' felony convictions from obtaining an undue hardship discharge, and finding good faith on behalf of one of the debtors nonetheless).

Here, it is held that Plaintiff has not met his burden to demonstrate a finding of good faith. As discussed more fully above in the first prong, Plaintiff has indeed maximized his income and has minimalized expenses. However, he has not demonstrated a good faith effort to repay the loans. While it is true that Plaintiff enrolled in an income-based repayment plan, Plaintiff has yet to make a single payment on the Department of Education loans.[5] Rather than attempting to do so, or taking any other meaningful steps towards satisfying his obligations, within approximately a year and a

---

[5] Plaintiff argues that he has a history of payments as he's has been making "payments" of $0 as required under the income-based repayment plan. This argument is absurd. "Payments" of nothing cannot demonstrate an effort to pay off existing loans.

16

half later since his dismissal from law school, Plaintiff instead filed the present adversary seeking dischargeability of the debt as an undue hardship.

Plaintiff argues that the aforementioned facts do not demonstrate bad faith and claims that the timing and motivation of the bankruptcy and adversary filing were due to an approaching wage garnishment as well as other incurred expenses after the bankruptcy was filed. Nonetheless, even if true that Plaintiff's intentions were pure and the facts in this case do not result in a finding of bad faith, conversely, the facts do not result in a showing of good faith either.

Furthermore, his criminal conduct weighs against good faith. Plaintiff was a law student who knew or had to know that his conduct could result not only in a criminal conviction but also be a bar to obtaining a license to practice law, and that this would negatively affect his financial situation. Under the facts presented here, it would be difficult to conclude that Plaintiff has shown a good faith effort to repay the student loans. *See, e.g., Davis*, 608 B.R. at 693 (good faith not found where debtor unable to demonstrate payments or justification thereto); *see also In re Chenault*, 586 B.R. 414, 421 (B.A.P. 6th Cir. 2018) (debtor's past criminal behavior was a condition of his own making and would not satisfy a finding of good faith). Therefore, Plaintiff has failed to meet his burden under the third prong of the *Brunner* test.

## CONCLUSION

For the aforementioned reasons, it is clear that Plaintiff has not met the strict requirements of the *Brunner* test. Accordingly, the relief requested by Plaintiff, that his student loan obligation to the Department of Education be determined to be dischargeable as an undue hardship pursuant to 11 U.S.C. § 523(a)(8), is DENIED, and the debt is determined to be nondischargeable.

ENTER:

Jack B. Schmetterer
United States Bankruptcy Judge

Dated this ___ day of February 2021

17